## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## SOUTHERN DIVISION

| | |
|---|---|
| CASIMIR L. LEBEAU, CLARENCE MORTENSON, RAYMOND CHARLES HANDBOY, SR., and FREDDIE LEBEAU, on behalf of themselves and all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CASE NO. CIV. 14-4056-KES |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### I.  INTRODUCTION

Based on the allegations in the Complaint – all of which are beyond dispute – the United States has breached its fiduciary obligations owed to Plaintiffs and countless other tribal members by flooding their lands, providing them inadequate compensation, and later admitting that said compensation was inadequate.  The United States then passed federal legislation that fairly compensated only the Cheyenne River Sioux Tribe, but forbade the Tribe from sharing any of those funds with Plaintiffs or other landowners or their heirs.  To add further insult to this injury, Defendant, in its Motion to Dismiss, mischaracterizes and misstates the law to avoid adjudicating this case on its merits.

Specifically, Defendant's insistence that no specific substantive source of law creates a fiduciary or trust obligation is flatly contradicted by the plain language of the General Allotment Act, the Act of March 2, 1889, as well as by the 1868 Treaty of Fort Laramie.  These acts and

this treaty created Defendant's fiduciary duty to guard Plaintiffs' subject land against alienation. As a result, when Defendant decided to flood the land, it had a duty to treat Plaintiffs fairly and to provide them adequate compensation.  It has not done so, despite compensating the Cheyenne River Sioux Tribe for this same breach of trust.

Defendant also urges dismissal of Plaintiffs' claims based on a host of affirmative defenses – res judicata, collateral estoppel, waiver, and statute of limitations.  None of these defenses are properly considered at this procedural stage, and all are devoid of merit in any event.  Because of language and cultural barriers, endemic racism, and coercion, Plaintiffs have never had a "full and fair opportunity" to litigate their claims.  Moreover, the statute of limitations has not run because Defendant's pattern of conduct against Plaintiffs continued until at least October 2011; in fact it continues to this very day under the continuing violations doctrine.  Moreover, the statute of limitations for the Indian Trust Accounting Statute claim cannot run until an accounting is had.  Finally, any limitations periods for Plaintiffs' various claims are subject to equitable tolling.

Defendant also misstates the law of sovereign immunity in seeking dismissal of Plaintiffs' claims.  The Administrative Procedures Act ("APA") indisputably provides a waiver of sovereign immunity that Defendant seeks to avoid by urging the Court to apply law related to claims for judicial review under the APA.  This, however, is not a claim brought under the provisions of the APA to review an agency action; it falls within the clear contours of the waiver of sovereign immunity in the APA.

For all these reasons, as discussed in detail below, the Court should deny Defendant's Motion to Dismiss and allow the Plaintiffs to have their day in court.

## II.  FACTUAL AND PROCEDURAL HISTORY

In 1944, Congress authorized the U.S. Army Corp of Engineers to develop a number of

water control projects, including the Pick-Sloan Missouri River Basin Project that involved the construction of six hydroelectric dams in the upper Missouri River basin.  Compl. ¶ 1.  The construction of one of these dams, the Oahe Dam, flooded a vast area of North and South Dakota, including over 104,420 acres of land within the Reservation of the Cheyenne River Sioux Tribe ("the Tribe").  Compl. ¶¶ 1-2.  Of this acreage, approximately 46,275 acres consisted of land owned by individual members of the Tribe (deed land) or held in trust by the United States for the benefit of these individual members of the Tribe (allotted land).  *See* Compl. ¶ 26.

The Cheyenne River Sioux Indian Reservation was created by the Act of March 2, 1889 (the "Act of 1889"), which diminished the borders of the Great Sioux Reservation to comprise five smaller reservations.  Compl. ¶ 24.  The Great Sioux Reservation was established by the 1868 Treaty of Fort Laramie ("1868 Treaty"), which set aside the ancestral homelands of the Great Sioux Nation for their "absolute and undisturbed use and occupation."  Compl. ¶¶ 17-18. In addition to establishing the Great Sioux Reservation, the 1868 Treaty established rights in individual Sioux Indians to receive farm land for "exclusive possession" and use for farming. Compl. ¶ 19.  As a result, the individual members of the Tribe who lost allotted or deeded land to the flooding created by the Oahe dam (the "Individual Landowners"), lost land to which they had a profound cultural and spiritual connection.  Compl. ¶ 3.  The Individual Landowners also lost the land that they had cultivated, used to graze livestock, used as homestead for families, and provided home to communities and associated institutions such as schools, churches, and shops. Compl. ¶ 27.

In the Flood Control Act of 1944, Congress authorized the U.S. Army Corps of Engineers to survey the lands to be taken.  Pub. L. No. 78-534, 58 Stat. 887, 903 (1944).  The Department

of Interior, through the Missouri River Basin Investigations Unit ("MRBI"), appraised the land

of the Individual Landowners.  In 1954, through the Public Law 83-776 (the "Act of 1954"),

Congress formally condemned the land on the Cheyenne River Sioux Indian Reservation,

including that of the Individual Landowners, and appropriated funds for payment pursuant to the

MRBI appraisal.  Pub. L. No. 83-776, 68 Stat. 1191 (1954).  The 1954 Act ostensibly allowed

tribal members to challenge the appraisals in federal court, but members faced language and

cultural barriers, a history of racial discrimination, and even outright threats to cancel Bureau of

Indian Affairs land-permits to prevent them from doing so.  *See* Declaration of Judith Zeigler

("Zeigler Decl.") at Ex. A (Deposition of C. Mortenson at 47:20-50:13); Ex. B (Deposition of R.

Handboy, Sr. at 13:8-10); and Ex. C (Deposition of C. LeBeau at 38:11-39:13).[1]  Nowhere in the

Act of 1954 did Congress put the Individual Landowners on notice that the MRBI appraisal was

deficient, nor did the Act state that it was abrogating any fiduciary or trust duties owed to the

Individual Landowners.

> After the United States began flooding the lands, relocation expenses that were provided

for in the Act of 1954 were often not delivered as promised.  Compl.  ¶ 28.  The areas of the

Cheyenne River Sioux Indian Reservation to which families were relocated were inhospitable

and did not provide the same homesteading and agricultural benefits as the now-flooded river

valleys. Compl. ¶ 29.  Some Individual Landowners were forced to relocate to far away urban

areas as economic refugees, encountering hardships in the form of racial discrimination and lack

of access to spiritual leaders able to perform ceremonies.  Compl. ¶ 29.  As a result of these

relocations, the flooding created economic inequality amongst members of the Tribe that had not

---

[1] A district court has authority to consider matters outside the pleadings where, as here, subject matter jurisdiction is challenged under Rule 12(b)(1).  *Osborn v. United States*, 918 F.2d 724, 728 n.4 (8th Cir. 1990).

previously existed.  Zeigler Decl. at Ex. B (Dep. of R. Handboy, Sr. at 56:2-57:23).

In November 2000, Congress enacted the Cheyenne River Sioux Tribe Equitable Compensation Act (the "CRSTECA").  Compl. ¶ 31.  In the CRSTECA, Congress acknowledged that there had not been fair compensation for the taking of the 104,492 acres of land (46,275 acres of which belonged to the Individual Landowners).  114 Stat. 2366.  As this Court previously noted, through the CRSTECA, "Congress has essentially admitted that it did not provide adequate compensation to the plaintiffs when it took their lands . . . ."  Order Granting Def.'s Mot. to Dismiss, Case 4:12-cv-04178-KES, ECF No. 32, at 15.  At the time of the passage of the CRSTECA, both the Tribe and the Individual Landowners and their heirs understood that the trust funds provided by the CRSTECA could be used to compensate the Individual Landowners for the historical injustice that they suffered.  Compl. ¶ 31.  In October 2011, however, the Bureau of Indian Affairs ("BIA") issued an opinion that the Cheyenne River Sioux Tribe was prohibited from distributing CRSTECA funds to the Individual Landowners.  Compl. ¶ 31; Zeigler Decl. ¶ 3, Ex. D.

In October 2012, Plaintiffs filed an action in this Court on behalf of a putative class of Individual Landowners and their heirs.  Plaintiffs' primary theory was that the Plaintiffs were entitled to compensation under the CRSTECA because that Act's use of the word "Tribe" included not only the Tribe as a political entity but also the individual members of the Tribe. The Court dismissed Plaintiffs' claims.  Order Granting Def.'s Mot. to Dismiss, Case 4:12-cv-04178-KES, ECF No. 32, at 3-13.  Plaintiffs also argued in their opposition to Defendant's Motion to Dismiss that the United States had breached its fiduciary and trust duties owed to Plaintiffs even if the CRSTECA did not provide them funding.  The Court, however, found that this theory had not been sufficiently plead in the Complaint and therefore dismissed the claim

without prejudice.  *Id.* at 15.  Plaintiffs filed this new Complaint to expressly allege claims for breach of trust and for an accounting.

## III.  MOTION TO DISMISS STANDARDS

Under Rule 12(b)(6), to "survive a motion to dismiss, the factual allegations in a complaint, assumed true, must suffice 'to state a claim to relief that is plausible on its face.'" *Northstar Indus., Inc. v. Merrill Lynch & Co.,* 576 F.3d 827, 832 (8th Cir.2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009).  "The court accepts as true all factual allegations, but is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *McAdams v. McCord,* 584 F.3d 1111, 1113 (8th Cir. 2009) (quoting *Ashcroft,* 556 U.S. at 678).  In contrast, in considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the district court has authority to consider matters outside the pleadings.  *Osborn*, 918 F.2d at 728 n.4.

## IV.  ARGUMENT

### A.  Plaintiffs Allege Claims that Survive Defendant's Motion to Dismiss.

#### 1.  The GAA, the Act of 1889, and the 1868 Treaty All Provide Substantive Sources of Law For Breach of Trust and Breach of Fiduciary Duty Claims.

##### a. "Limited" Trusts Are Not "Meaningless" Trusts.

The existence of a generalized trust duty between the United States and Indian tribes and individual Indians traces its roots back to Chief Justice Marshall's opinion in *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831).  Chief Justice Marshall remarked that the relation of the Indians to the United States "resembles that of a ward to his guardian." *Id.* at 17.  Chief Justice Marshall reasoned that the colonial might of the United States, which had given it complete "sovereignty

6

and dominion" over its territory, had placed the country's pre-colonial inhabitants in a "state of

pupilage." *Id.* Defendant argues that this general trust responsibility is insufficient to create a

cause of action and a more "specific" source of substantive law is required. The General

Allotment Act ("GAA"), the Act of 1889, and the 1868 Treaty all provide such specific sources

of substantive law.

Under their plain terms, the GAA and the Act of 1889 provide for the issuance of

"allotments" of land. Both provide that after an allotment was approved, the land would be held

"in trust for the sole use and benefit" of individual Indians.[2] 24 Stat. at 389; 25 Stat. at 891.

This language, "in trust for the sole use and benefit" of individual Indians was added to prevent

the alienation of such land. *See United States v. Mitchell ("Mitchell I")*, 445 U.S. 535, 544

(1980) ("It is plain, then, that when Congress enacted the General Allotment Act, it intended that

the United States 'hold the land . . . in trust' . . . simply because it wished to prevent alienation of

the land . . . and to ensure that allottees would be immune from state taxation.").

The 1868 Treaty has similar language, stating that various lands, including those at issue

in this litigation, would be "set apart for the absolute and undisturbed use and occupation" of the

members of the Great Sioux Nation. 15 Stat. at 636.[3] Incredibly, after noting that the "majority"

---

[2] As Defendant acknowledges, the statutory language initially called for this land to be held in
trust for a period of twenty-five years. Defendant fails to acknowledge, however, that for those
on the Cheyenne River Sioux Indian Reservation fortunate enough not to have had the alienation
restrictions removed from their land prior to 1931, the trust period was extended for 10 years in
two 1931 Executive Orders, *see* 25 C.F.R. Ch. 1, App'x 1, and then extended indefinitely by
Congress in 1934 in the Indian Reorganization Act, 25 U.S.C. § 462. Defendant's omission in
this respect creates the erroneous impression that this land was not held in trust in 1954. As a
matter of historical fact, the land of several Plaintiffs continued to be held in trust in 1954.
Zeigler Decl. at Ex. C (Dep. of C. LeBeau at 21:2-4); and Ex. A (Dep. of C. Mortenson at 25:6-
25).
[3] Due to the similarity of language among the 1868 Treaty of Fort Laramie, the GAA and the Act
of 1889, the 1868 Treaty should be read to establish a duty to guard the lands at issue against
alienation. The 1868 Treaty should also be read as such given the long historical backdrop of

of Indian treaties do not create individual rights and arguing that the 1868 Treaty did not create individual rights, Def.'s Br. at 17—on *the very next page* of its brief, Defendant begins discussing the multitude of treaty provisions regarding individual Sioux Indians, Def.'s Br. at 18-19.  These provisions clearly establish that the 1868 Treaty was a treaty creating both tribal/collective rights and individual rights, including the right to absolute and undisturbed use and occupancy.  That these duties were created through a treaty between the United States and the Great Sioux Nation as sovereigns does not diminish the fact that the treaty also imposes fiduciary duties on Defendant with respect to individual Sioux Indians.  *See Seminole Nation v. United States*, 316 U.S. 289, 295-97 (1942) (holding that Government could be liable for breach of fiduciary duty to individual Seminole members under Seminole Treaty).

In light of the express statutory reference to lands being held "in trust for the sole use and benefit" of individual Indians, it is disingenuous for Defendant to suggest that no "specific provision of any source of law [] gives the United States a specific fiduciary duty."  It would be impossible to imagine a more specific source of law than one that expressly uses the language "in trust."  As discussed below, the only way for Defendant to avoid this trust obligation is by misstating the law.

Defendant states, erroneously, that *Mitchell I* stands for the proposition that "the General Allotment Act creates only a limited trust relationship that does not impose any specific duty on the United States."  Def.'s Br. at 17.  A "limited trust", however, is not a "meaningless trust" and therefore *does* impose specific trust obligations on the United States (or else the trust would be a complete nullity and entirely meaningless).  An examination of the actual reasoning of *Mitchell I*

restraints against alienation of Indian lands.  *See* Cohen's Handbook of Federal Indian Law (2012 ed., Nell Jessup Newton, et al, eds.) ("*Cohen's*") § 5.04[3][a] ("The first Congress imposed a statutory restraint on alienation on all tribal land . . . .").

reveals precisely why the GAA (and by analogy the Act of 1889 and the 1868 Treaty) form a specific substantive basis for trust obligations in this case.  The holding of *Mitchell I* is simple—the GAA did not create a trust duty for the management of timber resources.  In other words, the Supreme Court held in *Mitchell I* that the trust relationship created by the GAA was "limited" in that it did not extend to timber resources.  This conclusion is supported by the purpose of the trust obligation that was created by the GAA—to prevent alienation of Indian lands.

In contrast to the claims regarding the timber resources at issue in *Mitchell I*, the Individual Landowners' allegations go directly to the purpose of the limited trust created under the GAA—to prevent alienation of their Indian-owned land.  If Defendant's interpretation is correct—that a trust duty is not created even by a statute that specifically states a trust is created for the specific purpose implicated—no trust duties would ever be created in any circumstances, an absurd result.  For example, according to Defendant's reasoning, notwithstanding the specific trust duties imposed by the GAA, the United States would be free to sell hundreds of acres of prime farm land for pennies without consent of the Indian allottee, all because the trust obligation referenced in the GAA is "limited."  Fortunately, this is not the law.  *See Cohen's* § 5.05[1][b], p.423 ("[A] statute may create a "bare or limited trust" . . . . Breach of this limited obligation would certainly give rise to a claim for equitable relief."); *see also Jones v. United States*, 9 Cl. Ct. 292 (1985) *aff'd* 801 F.2d 1334 (Fed. Cir. 1986) (treating failure to protect property from county taxation as breach of trust, but barring claim because statute of limitations had run).

### b.  Defendant Repeatedly Breached Its Fiduciary and Trust Duties.

Once there is a specific substantive basis imposing trust or fiduciary duties upon the United States, common law principles inform the extent and scope of those duties.  *See United*

*States v. Navajo Nation*, 556 U.S. 287, 301 (2009).  Even if the Pick-Sloan Act and the 1954 Act were inconsistent with the United States continuing to hold Individual Landowners' lands in trust, and therefore terminated the trust in the land, as discussed above, it is indisputable that such a trust did exist at the time the subject land was flooded.  Under common law principles, a trustee has certain duties upon the termination of a trust.  Upon termination, "the trustee has such powers and duties as are appropriate for the winding up of the trust."  Restatement (Second) of Trust § 344.  These powers and duties "are similar to the powers and duties of the trustee in administering the trust [], except so far as they are modified because of the fact that the trust is in the process of termination."  *Id.* § 344 cmt. a.  One of the duties that is not modified is the duty of loyalty, including the duty to "deal fairly" with beneficiaries.  *Id.* § 170(2).  The trustee also has a duty to exercise the care and skill of one of ordinary prudence.  *Id.* § 174.  Trustees must also deal impartially with beneficiaries.  *Id.* § 183.

Defendant, through the Executive Branch, violated these duties when dealing with the Individual Landowners in winding up the trusts associated with their properties.  First, the U.S. Army Corps of Engineers failed to exercise care and skill in appraising Plaintiffs' lands, appraising them for far less than their actual value.  Compl. ¶ 31.  Worse, the U.S. Army Corps of Engineers appraised Individual Landowners' lands in a discriminatory fashion—paying non-Indians more than Individual Landowners.  Compl. ¶ 30.  Sadly, the BIA also breached trust obligations by threatening and intimidating some Individual Landowners, conduct that caused those individuals to forego judicial proceedings.  Zeigler Decl. at Ex. A (Dep. of C. Mortenson at 47:20-50:13).  In addition, relocation expenses promised by Congress in the 1954 Act were never delivered.  Compl. ¶ 28.  Finally, the BIA failed to deal impartially with beneficiaries to the trusts, and to deal fairly with Individual Landowners, when it prohibited the Cheyenne River

Sioux Tribal Government from voluntarily distributing CRSTECA funds to the Individual

Landowners. Compl. ¶ 31.

### c. Congress Has Not (and Cannot) Abrogate Fiduciary and Trust Duties.

In attempting to avoid any responsibility for what Congress has expressly recognized was

inadequate compensation, Defendant claims that the "plenary power" *of Congress* absolves it.

At the same time, however, Defendant recognizes that Congress authorized the **"[U.S.] Corps [of**

**Army Engineers]** to acquire land for the Oahe Dam and reservoir . . . ." *See* 68 Stat. at 1191-

95.[4] Govt.'s Br. at 20 (emphasis added).  This is significant because unlike Congress, the

Executive Branch does *not* have plenary power over Indian affairs.  *See Cohen's* § 5.04[3][a]

("When the issue [is] not one of congressional power, however, but of executive management of

tribal resources, courts invoke[] principles of private trust law to hold the United States to 'the

most exacting fiduciary standards.'").  Because it is the acts of the Executive Branch -- the U.S.

Corps of Army Engineers and Department of Interior in appraising the land at unjustly low

values in the 1950s and the Department of the Interior treating Individual Landowners unfairly in

2011 (when it prevented the Cheyenne River Sioux Tribal Government from sharing any

CRSTECA funds) -- that form the basis of the Individual Landowners' claims, the plenary power

is not implicated by this action and cannot form a basis for dismissal.

Even if the plenary power were implicated here, it does not absolve Defendant of

liability.  Even if Congress abrogated its duty to hold lands in trust, and even if it abrogated some

provisions of the 1868 Treaty of Fort Laramie that are not implicated here, obligations to Indian

tribes are not abrogated wholesale merely because another obligation has been abrogated.  *See*

---

[4] Defendant notes that Congress provided "compensation," which notably omits the adjective
"just."  Of course, as Congress recognized later, "just compensation" was not provided to any of
the Individual Landowners.

*Minnesota v. Mille Lacs*, 526 U.S. 172, 195-202 (holding that 1855 Treaty with Chippewa and related legislation transferring land did not abrogate hunting and fishing rights secured by earlier 1837 Treaty); *see also Menominee Tribe of Indians v. United States*, 391 U.S. 404, 408-13 (1968) (holding that hunting and fishing rights of Menominee Tribe survived congressional act terminating tribe's status as a federally-recognized Indian tribe).  Congress has never abrogated Defendant's trust or fiduciary obligations associated with the winding up of the affairs of the trusts in the lands at issue here.  Significantly, at no point in time, did Congress ever authorize the U.S. Army Corps of Engineers or the Department of Interior to deal unfairly with the Individual Landowners, and certainly Congress never authorized the Executive Branch to racially discriminate against the Individual Landowners.

Defendant points to the 1954 Act as supposed evidence that Congress abrogated the trust and fiduciary duties imposed on the United States through the GAA, the Act of 1889, and the Treaty of Fort Laramie.  Abrogation of obligations owed to Indians, however, is "not to be lightly imputed."  *Menominee Tribe*, 391 U.S. at 412.  Only where Congress has actually considered a conflict between the duties it owes to Indians and the language of a statute is Congress deemed to have abrogated its obligations to Indians.  *United States v. Dion*, 476 U.S. 734, 739-40 (1986).  Defendant points to nothing in the Pick-Sloan Act or the 1954 Act that indicates Congress considered its obligation to treat Individual Landowners fairly when winding up the affairs of the trusts associated with their lands and consciously chose to terminate that obligation.  Neither does anything in the CRSTECA demonstrate that Congress considered its obligation to treat Individual Landowners fairly and consciously chose to terminate its obligation at that time.

In fact, the notion that the Pick-Sloan Act, the 1954 Act, or the CRSTECA was intended

to abrogate any trust or fiduciary obligation is directly contradicted by the structures of those acts.  The Pick-Sloan Act does not directly speak to Indian tribes at all.  The 1954 Act attempts to follow the 1868 Treaty of Fort Laramie's provision calling for three-fourths approval of the Great Sioux Nation prior to any cessation of land.[5]  The CRSTECA was passed to remedy the historical injustice caused by inadequate compensation under the 1954 Act.  None of these can be said to demonstrate conscious abrogation by Congress of the United States' duty to deal fairly with the Individual Landowners.

Finally, even if the plenary power were implicated, "plenary power" is not "limitless" or "unchecked" power.  *Black's Law Dictionary* (9th ed.) (defining "plenary power" as "Power that is broadly construed; esp., a court's power to dispose of any matter properly before it."); *Cohen's* § 5.02[1] ("The term 'plenary' indicates the breadth of congressional power to legislate in the area of Indian affairs . . . .").  Defendant concedes that the plenary power is not unbounded.  *See* Def.'s Br. at 20.[6]"  Though plenary, Congress' power is not absolute.  'While extending to all appropriate measures for protecting and advancing the tribe, *it [is] subject to limitations inhering in . . . a guardianship* and to pertinent constitutional restrictions.'"  *Littlewolf v. Lujan*, 877 F.2d 1058, 1063 (D.C. Cir. 1989) (alterations in original, emphasis added).  Here, the Individual

---

[5] To the extent any portion of the 1954 Act may be read to declare the U.S. Army Corps of Engineers appraisal of Individual Landowners' land as "just," such a declaration has been superseded by the CRSTECA's declaration that the compensation awarded under that appraisal was not fair.  114 Stat. 2366.

[6] Defendant cites *Menominee Tribe of Indians v. United States* for the proposition that the plenary power is only limited by the U.S. Constitution.  The reasoning of that case is that the United States' waiver of sovereign immunity in the Tucker Act and Indian Claims Commission Act excluded torts, such as breaches of trust or fiduciary duty, and therefore only claims premised on constitutional violations could be brought.   607 F.2d 1335, 1340-44  (Ct. Cl. 1979).  That case does not apply here because this action is brought pursuant to the United States' waiver of sovereign immunity in the APA, not the Tucker Act or Indian Claims Commission Act. There is no other reason to hold that the Legislative Branch is not liable for breaches of its trust or fiduciary duties, the "plenary power" is not an immunity doctrine.

Landowners have alleged a multitude of conduct by Defendant's acts that violate its duties to them as their guardian-trustee, specifically Defendant engaged in repeated unjust and discriminatory conduct from 1944 to the present.  The "plenary power" is not a shield to liability for such conduct.

> ## 2.   The Individual Landowners Have Stated A Claim Under Indian Trust Accounting Statute.

The Indian Trust Accounting Statute ("ITAS") provides that the Secretary of Interior must account for the daily and annual balance of funds held in trust for individual Indians that are deposited pursuant to 25 U.S.C. § 162a.  25 U.S.C. § 4011.  Section 162a, in turn, merely authorizes the Secretary of the Interior to withdraw funds from the U.S. Treasury and deposit them in trust accounts.  Because the Individual Landowners allege that a constructive trust was imposed for their benefit in the U.S. Treasury at the time their land was taken without adequate compensation, they have adequately alleged an ITAS claim.

At common law, when one wrongfully deprived another of property, a constructive trust was imposed on that property to prevent the unjust enrichment of the wrongdoer.  *In re Brook Valley VII, Joint Venture*, 496 F.3d 892, 901 (8th Cir. 2007) ("Courts impose a constructive trust when one party has acquired property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property.") (quotations omitted).Here, there can be no real dispute that Individual Landowners were wrongfully deprived of property—adequate compensation for the taking of their ancestral homelands.  Congress recognized as much.  Had adequate compensation been provided, it would have come from the United States Treasury.  Therefore, when it was not provided—a constructive trust was imposed on the Treasury.  Because these funds are trust funds from the U.S. Treasury for the benefit of individual Indians, the ITAS applies.  25 U.S.C. § 4011.

Defendant's sole rejoinder is its bare assertion, without citation, that "the Reform Act applies only to trust funds actually held." This unsupported assertion is not the law. "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993). Defendant has offered no reason that a constructive trust cannot form the basis of an ITAS claim,[7] and this Court should not read the ITAS as an abrogation of the well-established common law of constructive trusts. A constructive trust was imposed on the U.S. Treasury in 1954 when the Individual Landowners were not adequately compensated, and they are now entitled to an accounting of the amount of the constructive trust.

**B. Collateral Estoppel, Res Judicata, and Waiver Do Not Apply.**

The first basis Defendant offers to support a finding of res judicata—that the prior dismissal of Individual Landowners' claims *without prejudice* now bars them from re-alleging their claims in accordance with the Court's prior order in the 2012 Litigation—is indicative of the lack of merit of all their arguments. To begin, collateral estoppel, res judicata, and waiver are all affirmative defenses and therefore not a proper basis for Defendant's motion to dismiss. *See ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 728 F.3d 853, 961 (8th Cir. 2013) (noting that, generally, affirmative defenses must be affirmatively pled and proved); Fed. R. Civ. P 8(c)(1) (listing affirmative defenses).

Moreover, res judicata and collateral estoppel both require, among other things, that a claim reach a "final judgment [or final adjudication] on the merits," and that the party against whom it is asserted have had "a full and fair opportunity" to litigate the claim or issue

---

[7] Because the basis of the Individual Landowners' ITAS claim are funds in the form of cash in the U.S. Treasury, the cases cited by the United States regarding the application of the ITAS to real estate, see Govt.'s Br. at 22-23, are inapposite. None of those cases considered the application of ITAS to a constructive trust imposed on the U.S. Treasury.

previously.  *Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 509 (8th Cir. 2012); *United States v. McManaman*, 673 F.3d 841, 847 (8th Cir. 2012).  The Court's prior dismissal *without prejudice* is not a final judgment or adjudication on the merits.  *See Percefull v. Claybaker*, 312 Fed. App'x 827 (8th Cir. 2008) ("Because the prior state court complaint was expressly dismissed without prejudice, we conclude that it was not a final judgment on the merits for purposes of res judicata.").  Importantly, the Court's Order in the 2012 Litigation expressly declined to rule on the merits of the claims presented here; rather, the Court merely ruled that breach of fiduciary duty or breach of trust claims untethered from the theory that the CRSTECA expressly provided funds for the Individual Landowners had not been alleged in the Complaint in that action.  4:12-cv-04178 ECF No. 32 at 13-14.  As a result, the Court's prior ruling has no preclusive effect here.

Defendant also argues that res judicata or collateral estoppel should apply because the 1954 Act provided Plaintiffs an opportunity to bring an inverse condemnation action in federal court.  Def.'s Br. at 24.  Whether this constituted a "fair opportunity" to litigate their claims is a fact question not properly resolved on a motion to dismiss.  In fact, none of the Individual Landowners had a "fair opportunity" to litigate their claims.  Some were specifically threatened with the loss of their economic livelihood if they did not accept their appraisals.  Zeigler Decl. at Ex. A (Dep. of C. Mortenson at 47:20-50:13).  Others faced language or cultural barriers.  *Id*. at Ex. B (Dep. of R. Handboy, Sr. at 13:8-10).  Others acquiesced due to their knowledge, grounded on a history of broken treaty promises for which remedy existed, that endemic racism would prevent them from receiving a fair opportunity to litigate their claims.  *Id*. at Ex. C (Dep. of C. LeBeau at 38:11-39:13).  This is actual knowledge of futility, not mere perception: after all, a mere fifty-four years before the Pick-Sloan Act, the United States (the same sovereign in

whose courts these individuals would be expected to litigate their claims[8]) killed approximately 300 Sioux people, *mostly women and children*, in South Dakota during the Wounded Knee Massacre; as late as 1910, federal policy encouraged Indian children to be abducted from their homes and forced into boarding schools; and into the 1950s (the same time period as the opportunity for inverse condemnation the United States touts so heavily)  Indian boarding schools and their focus on assimilation flourished.  David Patton, *Tribal Law & Order Act of 2010: Breathing Life Into the Miner's Canary*, 47 Gonzaga L. Rev. 767, 769 (2011-12); Eric Davis, *In Defense of the Indian Child Welfare Act in Aggravated Circumstances*, Note, 13 Mich. J. of Race & Law 433, 439 (Spring 2008).

Defendant's argument that, amongst these conditions, the failure of Individual Landowners' to litigate their claims in 1954 should be construed as a waiver is similarly meritless.  Waiver requires a "voluntary and intentional" relinquishment of a known right. *ASARCO, LLC v. Union Pac. R. Co.*, -- F.3d --, 2014 WL 3882500, at *6 (8th Cir. 2014).  A waiver under duress is, by definition, not voluntary and not valid.  *Littrell v. City of Kansas City, Mo.*, 459 F.3d 918, 921 (8th Cir. 2006).  The conditions recited above constitute duress, and cannot form the basis of an implied waiver of Individual Landowners' claims.

## C.  The Statute of Limitations Does Not Bar Plaintiffs' Claims.

As a threshold issue, the timeliness of the Complaint is not a jurisdictional matter (as Defendant claims) but instead is an affirmative defense that is not appropriate for resolution at this early stage.  Even if it were considered, Plaintiffs' claims are timely.  Plaintiffs' breach of trust and breach of fiduciary duty claims accrued at the earliest in October 2011, and in fact have not accrued even today due to the continuing violations doctrine.  Moreover, because Plaintiffs

---

[8] Fortunately, with the passage of time and immense strides our country has made in the last half-century towards social justice, the United States courts now provide a more sympathetic forum.

have not yet received an accounting of their trust funds, the statute of limitations has not yet begun to run under the ITAS.  Even assuming *arguendo* that the six-year statute of limitations under 28 U.S.C. § 2401(a) has expired, Plaintiffs are entitled to equitable tolling.

### 1.   The Applicable Statute of Limitations In This Case is Not Jurisdictional and Does Not Bar Plaintiffs' Claims.

Whether the statute of limitations at 28 U.S.C. § 2401 should be treated as an affirmative defense or a jurisdictional issue is a matter of some dispute.  *Compare Miller v. Tony & Susan Alamo Foundation*, 134 F.3d 910, 915-916 (8th Cir. 1998) (treating 28 U.S.C. § 2401 as jurisdictional in a garnishment action) *with Loudner v. United States*, 108 F.3d 896, 903-904 (8th Cir. 1997) (reversing district court's determination that plaintiffs' claims were time-barred where the government acted contrary to common-law trust obligations).  Courts have also analyzed whether an ongoing violation was present as an alternate means of tolling the statute.  *See, e.g.*, *Izaak Walton League of America v. Kimbell*, 558 F.3d 751 (8th Cir. 2009).  As the Ninth Circuit has aptly stated, "where the issue of limitations requires determination of when a claim begins to accrue, the complaint should be dismissed only if the evidence is so clear that there is no genuine factual issue and the determination can be made as a matter of law."  *Sisseton-Whapeton Sioux Tribe, et al. v. United States*, 895 F.2d 588, 591 (9th Cir. 1990) (internal citations omitted).

Because the facts regarding accrual of the statute of limitations, and any tolling thereof, are not clear on the face of the Complaint, dismissal at this procedural stage is inappropriate.  Nonetheless, should the Court determine the statute of limitations is jurisdictional, pursuant to Rule 12(b)(1), matters outside of the complaint may be considered, *Osborn*, 918 F.2d at 728 n.4, and Plaintiffs have filed declarations to establish the Court's jurisdiction herewith.

### 2.   Plaintiffs Timely Filed Their Complaint Within the Statute of Limitations.

The applicable statute of limitations in this case is the six-year general statute of limitations for suits against the government.  28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.").  Here, Plaintiffs' claims accrued at the earliest in October 2011, but in fact have not fully accrued as each day they do not receive adequate compensation constitutes another injury that starts the statute of limitations anew pursuant to the continuing violations doctrine.

### a. Breach of Trust and Fiduciary Duty Claims Do Not Accrue Until Repudiation.

Generally speaking, accrual occurs when a party either knows, or in the exercise of reasonable diligence should have known, that it had a claim.  *Loudner*, 108 F.3d at 900.  For the equitable and declaratory relief sought here, however, the claim does not begin to accrue *until the trustee repudiates its trust obligations to the beneficiary.  Cobell v. Norton*, 260 F. Supp. 2d 98, 105 (D.D.C. 2003); *Pelt v. Utah*, 611 F. Supp. 2d 1267, 1283 (D. Utah 2009).  "[T]he reason for such a rule 'concentrates on the necessity of dealing fairly with a group of people still placed under a great disability of dependency and to which a greater obligation is owed than a narrowly legalistic view of what constitutes a technical duty.'"  *Manchester Band of Pomo Indians v. U.S.*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973) (citing *Dodge v. United States*, 362 F.2d 810, 813 (1866)).  A trustee's repudiation must be expressed as termination of the fiduciary relationship or an action inconsistent with the terms of the trust.  *Pelt*, 611 F. Supp. 2d at 1285.

As discussed above, Congress never passed any law abrogating the duties of the United States to wind up the affairs of the trust created by the GAA, the Act of 1889, and the 1868 Treaty of Fort Laramie.  Moreover, in 1954, the United States did not repudiate the trust through action—to the contrary, it did not recognize that the compensation provided in 1954 was

inadequate until the CRSTECA was passed in 2000.  Even then, the trust was not repudiated because the Tribe and the Individual Landowners understood that the CRSTECA funds could be used to compensate the Individual Landowners.  Defendant  repudiated its trust and fiduciary obligations at earliest in October 2011, when for the first time in history it was clear both that (1) Defendant had acknowledged the compensation in 1954 was inadequate and (2) the Individual Landowners would not be compensated, even indirectly by the Tribe sharing its CRSTECA funds because the BIA had prohibited such compensation.[9]

Defendant argues that Plaintiffs should have been aware of the taking when they were forced to leave their lands in 1948 and when they received unlawful and unjust compensation for those lands under the 1954 Act.  Mot. to Dismiss at 11.  This argument simply misses the point. It does not matter whether Plaintiffs knew of the taking when it occurred in 1948 because Defendant's repudiation of its trust and fiduciary obligations to Plaintiffs is based on Defendant's actions in October 2011 when the BIA prohibited the Tribe from sharing funds from the CRSTECA with the Individual Landowners.

Nor does the case law Defendant cites salvage its statute of limitations arguments. Different accrual rules exist for different causes of action. *See Dongelewicz v. PNC Bank Nat'l Ass'n*, 104 Fed. App'x 811, 817 (3d Cir. 2004) (noting that accrual rules for RICO claims and fraud claims are different).  Notably, Defendant cites cases regarding different causes of action

---

[9] The 2012 Litigation concerned whether the CRSTECA directly provided compensation to the Individual Landowners, and the Court held that the CRSTECA's plain language indicated that the funds belonged only to the Tribe.  Importantly, the 2012 Litigation did not touch on the merits of whether the CRSTECA funds could be used *by the Tribe* to provide additional compensation to the Individual Landowners as a "social welfare objective."  *See* Pub. L. No. 106-511 § 104(f)(2)(C).  Clearly, making the subset of the Tribe most affected by the Oahe Dam whole for their losses is a social welfare objective, particularly given how the Oahe Dam created social inequality within the Tribe by displacing some members.  Zeigler Decl. at Ex. B (R. Handboy, Sr. Dep. 56:2-57:23.)

for its argument that the Individual Landowners' claims have accrued.  Defendant predominantly relies upon a case involving a Quiet Title action, not the equitable and declaratory relief Plaintiffs seek here.  Def.'s Br. at 11-12.  The other case Defendant cites involves a tribe suing the United States to prevent payments under the Indian Claims Commission Act to lineal descendants where the underlying statute clearly contemplated at the time of enactment that the lineal descendants would be compensated.  *Id.* 11-12.  As discussed above regarding waiver, res judicata, and collateral estoppel—Plaintiffs were never afforded any real opportunity to negotiate or challenge the taking of their land.  Even assuming Plaintiffs were technically aware in 1954 that a *taking* had occurred, that knowledge has no bearing on Plaintiffs' claims of *breach of trust and fiduciary duty*.  Simply put, Defendant did not acknowledge that it provided inadequate compensation to the Individual Landowners until 2000, and it was not clear until October 2011 that Congress' acknowledgement was an empty promise for these Plaintiffs.  Consequently, Plaintiffs' claims are not time-barred.

> **b.  The Statute of Limitations Accrues Anew Each Day on Account of Continuing Violations Doctrine.**

October 2011 is the earliest date that a repudiation, and therefore accrual of Plaintiffs' claims, could be found.  In fact, the statute of limitations begins to run anew each day on account of the continuing violations doctrine.  On this point, there is a directly applicable and highly-analogous (both factually and legally) case from another federal district court, *Bodner v. Banque Paribas et al.*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000).  In *Bodner*, the court considered claims by descendants of Jewish customers of French financial institutions that the French financial institutions participated in a scheme to expropriate assets of Jewish customers during the Nazi occupation and failed to disgorge the assets to them as rightful owners after World War II.  *Bodner v. Banque Paribas et al.*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000).  Similar to the instant

case, the plaintiffs were the family members of victims whose assets were unjustly obtained as part of a campaign of misinformation and ethnic discrimination.  Also similar to the instant case, the victims' assets were never returned to the victims or their family members.  *Id.*  In discussing the continuing violations doctrine, the court stated "[f]ederal courts have found the statute of limitations must accrue from the date of that last wrongful act where there is a continuing wrong" and "'the limitations period for a continuing offense does not begin until the offense is complete.'"  *Id.* (internal citations omitted).  The *Bodner* court also found the circumstances supporting application of the continuing violation doctrine particularly compelling because of the continued failure to return the plaintiffs' assets, as well as failure to provide facts and information relating thereto.  *Id.* at 134-35.

Just as in *Bodner*, here, the Individual Landowner's property has not been returned and they have never received adequate compensation for their loss of property.  This is a historical injustice that is a continuing wrong—the offense against the Individual Landowners is not yet complete, as they continue to suffer the knowledge that Defendant took on fiduciary and trust obligations that it then breached and continues to breach by depriving the Individual Landowners of their ancestral homelands or adequate compensation for the flooding.  Contrary to Defendant's characterization, the continuing injustices Plaintiffs suffer with respect to their lands are not a "lingering effect of an unlawful act."  Rather, each is its own unique and unlawful act (the original taking, the unjust compensation under the 1954 Act, the unclear/ambiguous language in the CRSTECA, and the decision to remedy the unjust amounts paid to the Cheyenne River Sioux Tribal Government, but not the Plaintiffs and the Individual Landowners).  Regardless, Plaintiffs and the Individual Landowners detrimentally relied upon the good faith of their fiduciaries, the Defendant's agents, who continue to refuse them just and fair compensation.  Thus, the six-year

22

federal statute of limitations should not serve to deny any portion of Plaintiffs' claims.  The Individual Landowners have not yet been adequately compensated for the taking of their lands; nor do they have the benefit of the return of the lands.  Zeigler Decl. at Ex. A (Dep. of C. Mortenson at 96:17-98:2); and Ex. C (Dep. of C. LeBeau at 35:7-36:25).  Because breaches of Defendant's trust and fiduciary duties continue until property (or just compensation for that property) is returned, Defendant remains in breach and a continuing violation exists.

Defendant's attempt to defeat application of the continuing violation doctrine fails for a number of reasons.  First, while the APA provides a waiver of sovereign immunity, Plaintiffs do not bring a cause of action under the APA.  Therefore, that claims brought under the APA are not subject to the continuing violation doctrine, Def.'s Br. at 12, is irrelevant.  Second, the only Eighth Circuit case cited by Defendant, *Izaak Walton*, involved claims under the APA.  *Izaak Walton* is factually distinct, involving an environmental group's challenge of the U.S. Forest Service's decision to construct a snowmobile trail.  *Izaak Walton* has no application to claims premised on the unique trust and fiduciary obligations Defendant owes to the individual members of Indian tribes.

### c.  Plaintiffs Are Entitled to a Full Accounting and the Applicable Statute of Limitations Does Not Run Until the Accounting is Provided.

"It is often the case . . . that the trustee can breach his fiduciary responsibilities of managing trust property without placing the beneficiary on notice that a breach has occurred.  *It is therefore common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust.*"  *Pelt*, 611 F. Supp. 2d at 1283 (emphasis in original).  Thus, absent repudiation, the statute of limitations will not be held to accrue until a final, meaningful accounting has been provided.  Moreover, the Appropriation Act for the Department of the Interior provides that "the statute of

limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected tribe *or individual Indian* has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss." Consolidated Appropriations Act, 2014, Pub. L. No. 113-76 (2014) (emphasis added); *see also Manchester Band*, 363 F. Supp. at 1248 (finding that plaintiffs were entitled to an accounting).

Defendant mischaracterizes Plaintiffs' request for an accounting as a simple real property claim.  As demonstrated previously, the ITAS applies in the instant case.  Contrary to the Defendant's assertions, Plaintiffs have alleged that Defendant held funds in trust for them and have alleged mismanagement of the funds through their failure to be disbursed.  *See also* Def.'s Br. at 13- 14.  The moment Plaintiffs' lands were taken for the Oahe Dam project in exchange for compensation, they were converted to funds.  A constructive trust was imposed on the United States Treasury in the amount of the inadequacy of the compensation.  These remained funds when it was determined that the compensation provided for the lands under the 1954 Act was unjust and unlawful.  The treatment of the lands as constructive trust funds was still in force when additional compensation was established under the CRSTECA.  Finally, the treatment of the land as constructive trust funds was reinforced in 2011 when the BIA sought to remedy the prior unjust compensation by making payments to the Cheyenne River Sioux Tribal Government.  As Defendant acknowledges in its Motion to Dismiss, if the ITAS applies, then the statute of limitations does not run until the Plaintiffs have been furnished with an accounting. Def.'s Brief at 13-14.

There has never been an open repudiation of Defendant's trust relationship with Plaintiffs and the Individual Landowners.  Defendant included Plaintiffs' 46,275 acres of land in the original 1948 taking, included Plaintiffs' and the Individual Landowners in the compensation

provided under the 1954 Act (no matter how egregious or unjust that compensation may have been), and drafted such ambiguous language in the CRSTECA that both the Cheyenne River Sioux Tribal Government and the Plaintiffs believed that the CRSTECA was intended to compensate them both (and the Individual Landowners) for the unjust and unlawful compensation provided under the 1954 Act.  Thus, contrary to the precedent Defendant cites, a final accounting is imperative.  As beneficiaries of a trust relationship with Defendant, Plaintiffs are entitled under the ITAS to seek an accounting, and it is only once this accounting has been provided that the statute of limitations starts to run.

> **3.  If the Court Determines that the Applicable Statute of Limitations Has Expired, Plaintiffs Are Entitled to Equitable Tolling.**

Under the equitable tolling doctrine, the statute of limitations is tolled if the party asserting equitable tolling is delayed or mislead by the opposing party into missing the statute of limitations for filing claims.  *Samish Indian Nation v. U.S.*, 58 Fed. Cl. 114, 118 (Fed. Cl. 2003). This doctrine applies when the party seeking equitable tolling actively pursues its claim and extraordinary circumstances stand in the party's way.  *See id.; Felter v. Norton*, 412 F. Supp. 2d 118, 126 (D.D.C. 2006).  "Extraordinary circumstances are circumstances beyond the control of the complainant which make it impossible to file a complaint within the statute of limitations, including government conduct that 'lulled' a complainant into inaction, and falsities that misled a petitioner."  *Id.* (citing *Curtiss v. Mt. Pleasant Corr. Facility*, 338 F.3d 851, 855 (8th Cir. 2003)) (other internal citations omitted).

Plaintiffs and Individual Landowners have been kept in ignorance of vital information necessary to effectively pursue their claims without any fault or lack of due diligence on their part.  Attempts by the Individual Landowners in 1954 to challenge the paltry compensation they received for their land was met with deception, evasiveness, and outright coercion.  Defendant

25

took advantage of the Individual Landowners' lack of education and difficulties with the English language to ensure that they would not understand, be aware of, or pursue their legal rights. Zeigler Decl. at Ex. D (Dep. of F. LeBeau at 9:11-24); Ex. B (Dep. of R. Handboy, Sr. at 12:20-13:4, 22:3-23:2, 26:5-27:10, 34:3-9, 36:11-37:2); and Ex. C (Dep. of C. LeBeau at 10:3-25). Defendant fortified this effort through a campaign of confusion and misinformation.  For example, Defendant failed to notify the Individual Landowners when it began taking aerial photographs of the land to be flooded, sent out appraisers, and met with tribal officials about compensation for the Individual Landowners.  *Id*. at Ex. A (Dep. of C. Mortenson at 33:10-23, 39:5-17, 58:3-18); Ex. D (Dep. of F. LeBeau at 25:12-21, 28:8-23); and Ex. C (C. LeBeau at 23:1-24:21).  Defendant gave them no advance notice of the appraised value of their lands, first presenting the valuations to the Individual Landowners at their individual meetings with the Army Corps of Engineers where they were told to immediately sign compensation documents. *Id*. at Ex. A (Dep. of C. Mortenson at 43:16-44:24, 47:20-50:25 72:5-15); Ex. D (Dep. of F. LeBeau at 30:8-32:22, 35:2-17, 43:3-5); and Ex. C (Dep. of C. LeBeau at 23:1-24:21).  In fact, it was not until years after those meetings that the Individual Landowners received a copy of the appraisal document, if at all, and the appraisals were "shabby," at best.  *Id*. at Ex. A (Dep. of C. Mortenson at 46:12-20, 60:16-61:15, 63:1-20, 64:4-65:19, 74:4-75:20, 77:14-80:11, 81:21-82:21, 111:6-112:2); Ex. D (Dep. of F. LeBeau at 29:13-30:5, 43:6-44:11); and Ex. C (C. LeBeau at 23:1-25).

Defendant also made promises to the Individual Landowners regarding the compensatory and other benefits they would receive as a result of the Oahe Dam project that it failed to keep, such as repair of relocated homes and provision of electricity and water.  Zeigler Decl. at Ex. B (Dep. of R. Handboy, Sr. at 17:23-18:3, 19:19-20:10, 21:12-22, 47:1-19, 58:19-60:6).  Notably,

Defendant provided these promised benefits to at least some non-Indians who had their lands flooded through the same project. *Id*. (Dep. of R. Handboy, Sr. 58:12-60:6).  Finally, the United States ensured that the Individual Landowners would be too frightened for their own livelihood to pursue their rights.  *Id*. at Ex. D (Dep. of F. LeBeau at 28:24-29:12, 31:24-32:22); Ex. C (Dep. of C. LeBeau at 18:1-8); and Ex. A (Dep. of C. Mortenson 47:20-50:13).  By including the acreage owned by the Individual Landowners with the total acreage in the 1954 and CRSTECA, Plaintiffs were unfairly and deceptively induced into believing that they would be fairly and justly compensated for their lands.  More importantly, until the BIA compensated *only* the Tribe for the woefully deficient sums paid under the 1954 Act, Plaintiffs believed that the initial unjust and unfair sums they received would be remedied.  Thus, Defendant lulled Plaintiffs into inaction and placed them in a situation that *de facto* prevented them from pursuing their rights.

The authority Defendant cites does not diminish Plaintiffs' right to equitable tolling. Plaintiffs have already demonstrated that in the Eight Circuit the statute of limitations is an affirmative defense, not a jurisdictional bar.  The sole case Defendant cites in its attempt to preclude equitable tolling is a Ninth Circuit case and is not controlling precedent in the Eighth Circuit for equitable tolling purposes.  Def.'s Br. at 12.  Moreover, Plaintiffs have provided ample evidence that they had no real opportunity under the 1954 Act to challenge the appraised value of their lands.  *Id.*  This Court need only look to the purpose behind the enactment of the CRSTECA to corroborate the veracity of Plaintiffs' claims.

**D.  This Court Has Subject Matter Jurisdiction Over This Case and Defendant's Motion to Dismiss Should be Denied.**

Defendant's final claim, that this Court lacks subject matter jurisdiction, is also without merit.  Defendant alleges that this Court lacks jurisdiction because Plaintiffs have failed to identify an applicable waiver of Defendant's sovereign immunity, and that Plaintiffs cannot

properly rely on the waiver contained in § 702 of the APA because they "cannot demonstrate a substantive source of law that the United States violated," and because Plaintiffs have an adequate remedy in the Federal Court of Claims under the Tucker Act, 28 U.S.C. § 1491. Def.'s Brief at 25-26, 28. Further, Defendant alleges that Plaintiffs' Complaint is effectively a request for compensation for an alleged taking, for which exclusive jurisdiction is with the Court of Federal Claims. *Id.* at 26-28. Contrary to Defendant's claims, however, Plaintiffs' claims are not seeking "money damages" as that term is defined for purposes of the APA's waiver provision. The plain language of APA § 702 makes clear that § 702 effects a waiver of sovereign immunity in all cases seeking other than money damages. The legislative history and case law interpreting and applying § 702 make clear that the type of relief Plaintiffs seek here does not fall within the exception for claims seeking money damages. Finally, Defendant's argument, that § 704 of the APA excludes from § 702's waiver those claims for which adequate remedies are elsewhere available, also fails. This argument improperly commingles two different statutory provisions and wrongly assumes Plaintiffs' claims are brought pursuant to the APA—which they are not. Because Plaintiffs have properly alleged a waiver of Defendant's sovereign immunity pursuant to § 702 of the APA, the Court should deny Defendant's motion to dismiss for lack of subject matter jurisdiction.

### 1. The APA's Waiver is Not Limited to APA Claims and Does Apply to Plaintiffs' Claims Here.

Since its enactment in 1946, the APA has instructed that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Act of June 11, 1946, ch. 324, § 10(a), 60 Stat. 237, 243 (codified at 5 U.S.C. § 702). In 1976, Congress amended the APA, expressly removing the defense of sovereign immunity as a bar to judicial review of

federal administrative action.  To ensure the existence of a waiver, Congress added the following sentence to 5 U.S.C. § 702: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." Act of Oct. 21, 1976, Pub. L. No. 94-574, § 1, 90 Stat. 2721 (codified at 5 U.S.C. § 702); *see also* H.R. Rep. No. 94-1656, at 3 ("The amendment made to section 702 of title 5 would eliminate the defense of sovereign immunity as to any action in a Federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of the agency."), *as reprinted in* 1976 U.S.C.C.A.N. at 6123.  Congress took this step to provide a "safety valve to ensure greater fairness and accountability in the administrative machinery of the [Federal] Government."  H.R. Rep. No. 94-1656, at 9 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6129-30.

The waiver of sovereign immunity found in the APA thus allows a person to sue the federal government over unlawful agency action for other than money damages, including suits for declaratory and injunctive relief.  Courts, including the Supreme Court and the Eighth Circuit Court of Appeals, have consistently held that § 702 of the APA waives sovereign immunity against the United States in all actions against the government seeking other than money damages.  *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("There are two reasons why the plain language of this amendment does not foreclose judicial review of the actions brought by the State challenging the Secretary's disallowance decisions.  First, insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages.  Second, and more importantly, even the monetary aspects of the relief that the State sought are

29

not "money damages" as that term is used in the law."); *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("Trudeau has limited the relief he seeks to a declaratory judgment and an injunction, and there is no doubt that § 702 waives the Government's immunity from actions seeking relief other than money damages."); *Sabhari v. Reno*, 197 F.3d 938, 943 (8th Cir. 1999).

Defendant incorrectly asserts that because Plaintiffs do not identify any substantive source of law sufficient to establish waiver under the APA, their claims must be dismissed for lack of jurisdiction.  As discussed previously, the GAA, the Act of 1889 and the 1868 Treaty of Fort Laramie are all such specific substantive sources of law.  Despite Defendant's claims to the contrary, the "[a]bolition of sovereign immunity in § 702 is not limited to suits 'under the Administrative Procedure Act'; the abolition applies to every 'action in a court of the United States seeking relief other than money damages. . . .  No words of § 702 and no words of the legislative history provide any restriction to suits 'under' the APA."  4 K. Davis *Administrative Law Treatise* § 23:19 at 195 (2d ed. 1983); *see also Red Lake Band of Chippewa Indians v. Barlow*, 846 F. 2d 474, 476 (8th Cir. 1988) ("Contrary to the Secretary's second argument, the waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA.  It is dependent on the suit against the government being one for non-monetary relief."); *Black Hills Inst. of Geological Research v. S.D. Sch. of Mines & Tech.*, 12 F.3d 737, 740-41 (8th Cir. 1993) (holding that § 702's waiver of sovereign immunity is not limited to cases brought under the Administrative Procedure Act); *Raz v. Lee*, 343 F.3d 936, 938 (8th Cir. 2003) ("[T]he United States does not enjoy immunity from Raz's injunctive-relief action, because section 702 of the Administrative Procedure Act (APA) expressly waives sovereign immunity as to any action for nonmonetary relief brought against the United States."); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The

APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); *Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984) ("With respect to claims for non-monetary relief, the 1976 amendments to § 702 of the Administrative Procedure Act . . . eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity.").  In fact, even the cases Defendant cites acknowledge that the APA's waiver is not limited to APA claims.[10]

### 2.  The APA's Waiver Applies to Plaintiffs' Claims, Which Seek Relief Other Than Money Damages.

Plaintiffs have properly asserted a waiver of Defendant's sovereign immunity under § 702 of the APA, 5 U.S.C. § 702.  As noted above, pursuant to § 702, Congress has expressly authorized suits against the United States in actions stating a claim that an agency or an officer or employee thereof acted or failed to act, and seeking relief other than money damages.  Moreover, the plain language and legislative history of § 702 make clear that the waiver contained in this statutory provision acts as a general consent to suits requesting equitable relief from administrative action or inaction.  *See United States v. Mitchell,* 463 U.S. 206, 227 n. 32 (1983); *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988).  Here, Plaintiffs' Complaint unambiguously seeks the following equitable relief:

- An order certifying the named Plaintiffs as representatives of classes consisting of (1) the original owners of land that was taken by the federal government to construct the Oahe Dam and Lake Oahe, and (2) the heirs of the original owners of land that was taken by the federal government to construct the Oahe Dam and Lake Oahe.  Compl. at 14, Prayer for Relief ¶ A.

---

[10] *See, e.g.*, Def.'s Brief at 26, citing *El Paso Natural Gas v. United States*, 750 F.3d 863 (D.C. Cir. 2014) ("Nor is sovereign immunity in dispute. The Government has not argued that its immunity precludes the trust claim, [] which comes as no surprise since the second sentence of § 702 of the APA waives sovereign immunity not just for APA claims but also, more broadly, for claims 'seeking relief other than money damages.'").

- A decree construing Defendant's trust obligations to Plaintiffs and members of the various classes, declaring the Defendant has breached its trust obligations to the named Plaintiffs and the class, and directing practices in conformity with Defendant's obligations. Compl. at 14, Prayer for Relief ¶ B.

- A declaration that the United States' failure to provide just compensation to Individual Landowners and their heirs for their taken land is a breach of its common law fiduciary duty. Compl. at 14, Prayer for Relief ¶ C.

- A declaration that the United States has not provided Plaintiffs and members of the class with a full and complete accounting of their trust funds. Compl. at 14, Prayer for Relief ¶ D.

- A decree ordering an accounting of the trust funds owed to the Individual Landowners and their heirs. Compl. at 14, Prayer for Relief ¶ E.

- Plaintiffs' attorneys' fees and costs, to the extent allowed by applicable law. Compl. at 14, Prayer for Relief ¶ G.

- Any such further relief as the Court deems just and equitable. Compl. at 14, Prayer for Relief ¶ H.

In its brief, Defendant attempts to construe the relief Plaintiffs seek as money damages alleging that "while styled as an action for declaratory relief [Plaintiffs Complaint] is in fact a request for compensation for an alleged taking that occurred many years ago." Def.'s Brief at 26. But Plaintiffs could not be clearer that they do not seek to recover money damages. And as noted above, claims for declaratory and injunctive relief fall squarely within § 702's waiver provision. *Bowen v. Massachusetts*, 487 U.S. at 893 ("[I]nsofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages.").[11]

Even assuming Defendant's categorization of Plaintiffs' claims as seeking the payment of money had merit (and it does not), this Court would still have jurisdiction under § 702 of the

---

[11] The Supreme Court in *Bowen* recognized the breadth of the waiver contained in § 702 and the narrowness of the exception for actions seeking money damages, stating, "Thus, the combined effect of the 1970 Hearing and the 1976 legislative materials is to demonstrate conclusively that the exception for an action seeking 'money damages' should not be broadened beyond the meaning of its plain language." *Bowen,* 487 U.S. at 900.

APA.  The Supreme Court in *Bowen* clarified that not all actions seeking the payment of money are actions for "money damages" under § 702.  In *Bowen*, the State of Massachusetts sued to overturn a decision by the United States disallowing reimbursement under the Medicaid Act. The Supreme Court held the State's suit was not one "seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it [was] a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money."  *Bowen*, 487 U.S. at 900; *see also Middlebrooks v. United States*, Civ. No. 12-4033-KES, 2014 WL 1123488 (March 20, 2014) ("In this case, Middlebrooks is not requesting money to make him whole for past wrong, he is requesting that the government be compelled to pay what he contends it was already obligated to pay.").  Similarly, here, Plaintiffs seek equitable and declaratory relief requiring Defendant to be compelled to comply with its trust and fiduciary obligations and provide Plaintiffs with an accounting of their trust funds.

> **3.   Section 704 of the APA Does Not Apply and No Other Adequate Remedy is Available.**

Defendant also argues that the APA does not waive Defendant's sovereign immunity because "assuming that Plaintiffs had brought their claims in a timely manner . . . Plaintiffs would have an adequate remedy in the Court of Federal Claims under the Tucker Act."   (Def.'s Brief at 28).  This argument, based on a fundamentally flawed understanding of Plaintiffs' claims, is contrary to Supreme Court precedent and the plain language and legislative history of the APA's waiver provision, and is factually and legally inaccurate.

Defendant's argument is based on a mischaracterization of Plaintiffs' claims in this case. As explained above, Plaintiffs do not seek money damages, but only equitable and declaratory relief.  Consequently, the Tucker Act, which gives the Court of Federal Claims exclusive jurisdiction over damages actions in excess of $10,000, is not applicable with respect to

Plaintiffs' claims in this case.  28 U.S.C. § 1491; *see also Bowen*, 487 U.S. at 901-02.  Further, Plaintiffs' claims arise not under the APA, but under Defendant's fiduciary and trust obligations owed to the Individual Landowners and their heirs.  Therefore, the review provisions of the APA, including those under § 704, do not apply to Plaintiffs' action here.

Defendant's argument confuses two separate provisions of the APA—5 U.S.C. §§ 702 and 704—only one of which (§ 702) in fact deals with the issue of sovereign immunity.  The plain language and legislative history of APA § 702 establish conclusively that the only requirement for § 702's waiver to apply is that the action seek relief other than money damages. As discussed above, § 702's waiver provision applies regardless of whether the underlying action is an action under the APA.  *See, e.g.*, *Red Lake Band*, 846 F.2d at 476 ("Contrary to the Secretary's second argument, the waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA.  It is dependent on the suit against the government being one for non-monetary relief."); *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006) (citing *Red Lake Band*, 846 F.2d at 476) (rejecting agency's argument that § 704's "final agency action" language qualifies § 702's waiver of sovereign immunity because argument conflicted with § 702's plain language, legislative history and existing precedent).  Defendant cites no case law whatsoever to support its arguments.  Thus, Defendant's argument is meritless and should be rejected.

Even if the provisions of § 704 of the APA must be satisfied for Plaintiffs to rely on the waiver contained in § 702 (and they do not), Plaintiffs clearly meet that burden here.  Section 704 provides, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  Contrary to

Defendant's assertions, the Tucker Act does not present an "other adequate remedy in court" for the equitable relief Plaintiffs seek.

The Supreme Court rejected this same argument in *Bowen*, concluding that "[t]he Secretary's novel submission that the entire action is barred by § 704 must be rejected because the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court." *Bowen*, 487 U.S. at 901. The Claims Court does not have the general equitable powers of a district court to grant prospective relief. Indeed, the Supreme Court has recognized that the Court of Claims has no power to grant equitable relief whatsoever. *Id*. at 905; *see also Richardson v. Morris,* 409 U.S. 464, 465 (1973). Moreover, the availability of any review of Plaintiffs' claims here in the Claims Court is doubtful. It is therefore clear that the theoretical relief available to Plaintiffs in the Court of Claims is not an adequate substitute for prospective relief available in the district court.

Because Defendant has waived its sovereign immunity under § 702 of the APA, this Court has proper jurisdiction over Plaintiffs' action.

## V. CONCLUSION

Plaintiffs respectfully request that the Court deny the Defendant's motion to dismiss in its entirety. Given the complexity of Defendant's motion, Plaintiffs request oral argument pursuant to D.S.D. Civ. LR 7.1(C).

Respectfully submitted,

Dated: September 8, 2014

/s/ Judith K. Zeigler_____
Judith K. Zeigler
JUDITH K. ZEIGLER LAW, PC
PO Box 1448
Sioux Falls, SD 57101-1448
(605) 274-0086 (telephone)
(888) 809-9084 (facsimile)
judy@jkzlaw.com

Vernle C. Durocher (Minn. Bar #0208966),
Kristin M. Stastny (Minn. Bar # 0390193),
Forrest K. Tahdooahnippah (Minn. Bar # 0391459)
*To apply for pro hac vice admission*

Dorsey & Whitney LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
(612) 340-2600 (telephone)
(612) 340-2868 (facsimile)

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Counsel of record hereby certifies pursuant to Local Rule 7.1B.1 of this Court that Plaintiffs' foregoing brief is produced using 12-point Time New Roman type 35 including footnotes and contains approximately 10,982 words, excluding the Caption, Signature lines, and this Certificate of Compliance, and said word count is less than the total words permitted by the rules of the Court. Counsel relies on the word count of the Microsoft Word (2013) software program used to prepare the brief.

Dated:  September 8, 2014

/s/ Judith K. Zeigler

Judith K. Zeigler